# EXHIBIT "A"

# JOINT VENTURE AGREEMENT

This JOINT VENTURE AGREEMENT (this "**Agreement**") is dated as of August 16, 2022 (the "**Effective Date**") and is made by and between BERONE CAPITAL ("**Managing Member**") and PRIME CAPITAL VENTURES, LLC ("**PC Member**") and jointly the ("**Members**") regarding the operations of this Agreement.

## RECITALS

WHEREAS, the Members desire to enter into this Joint Venture Agreement.

WHEREAS, the Members desire to establish their rights and obligations in connection with forming this Agreement.

WHEREAS, the purpose and business of the Agreement is to provide funding for "Qualified Projects," as defined in Section 1.5 herein below;

NOW THEREFORE, in consideration of the mutual promises contained herein and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the Members hereby agree to the following:

## AGREEMENT

### ARTICLE 1
### FORMATION AND ORGANIZATION

Section 1.1.   Formation.   The Members agree to enter into this Agreement.

Section 1.2.   Basic Rights of Members.   The Members hereby enter into this Agreement to set forth certain rights and obligations of the Members, and the procedures for managing and operating the Company and related matters.  Except to the extent stated in this Agreement, (a) the rights and obligations (i) Members and (ii) among the Members and (b) the management, operation, termination, and dissolution of the Agreement shall be governed by the state of New York.

Section 1.3.   Name.   The business of the Agreement shall be to conducted business under the name Prime Capital Ventures, LLC or such other name as the Members may hereafter approve.

Section 1.4.   Term.   The existence of the Agreement commenced on the date of execution shall be perpetual, unless terminated or dissolved earlier pursuant to the terms of this Agreement or by operation of law.

Section 1.5.   Business.   The business of the Agreement is solely to (a) provide funding to Qualified Projects, (b) provide equity for joint ventures ("Qualified JV Projects"), and (c) acquire qualified assets ("Qualified Assets" and together with Qualified Projects and Qualified JV Projects, collectively, "Company Projects"), and (d) do any and all other acts or things that may be incidental or necessary to carry on the business of the Agreement as described in clauses (a) and (b) and (c) above.

Projects shall be limited to the areas of real estate, renewable energy, business expansion, or otherwise agreed to in writing by the Members. The Business of the Agreement is to be funded through the Initial Contributions of the Members and the Business Lines of Credit (each a "Business LOC") obtained from one or more approved lenders (each a "Network Lender"), and each Business LOC shall be secured by the specific company project for which the particular Business LOC is being used to fund. The Members may obtain more than one Business LOC at any given time.

Project LOC's shall be advanced to various Qualified Projects during the course of the company's business. Each Project LOC shall be secured by its own LOC Documents.

Section 1.6.  Member Responsibilities.  The Members' responsibilities shall include the following:

(a)  Whenever the PC Member has identified a project, the PC Member will (i) oversee the documentation of the project funding ("Project Funding") for the project, (ii) monitor progress of the project, (iii) supervise and approve the advance of funds for the project, (iv) administer all aspects of the relationship with the property owner where each company project is located, and (v) administer and service the related project funding.

(b)  Only after agreed upon by the Members, the Managing Member shall facilitate the initial Business LOC through Network Lenders necessary for the PC Member to identify and secure additional projects on an on-going basis.

## ARTICLE 2
## FINANCING AND OTHER CAPITAL TRANSACTIONS

Section 2.1.  Approved Financing. The Members will approve the PC Member borrowing up to the initial Business LOC amount (the "**Initial Business LOC**") pursuant to and on the terms set forth in the Business LOC Documents, if approved.

Section 2.2.  Execution of and Compliance with Business LOC Documents.

(a)  Execution.  The Managing Member is hereby authorized to execute and deliver Initial Business LOC Documents evidencing or securing such Initial Business LOC from the network lender.  The PC Member agrees to ensure that the Business LOC Documents reflect in all material respects the terms and conditions set forth herein.

(b)  Compliance.  The PC Member shall use its good faith efforts to cause the Members to comply with all covenants, terms, and conditions of all Business LOC Documents.

## ARTICLE 3
## DISTRIBUTIONS

Section 3.1.  Distributions of Available Cash from Operations and Net Capital Transaction Proceeds.

(a)  General Priority Rules.  All distributions of Available Cash from Operations and Net Capital Transaction Proceeds shall be made in the order of priority.  The Members identified at

each level of priority shall (1) receive distributions at the same time without preference or priority of one Member over another until all Members at that level have received the full amount to which they are entitled and before any distributions are made or paid to any Members for amounts in a lower level of priority and (2) if distributions at a priority level described are not sufficient to pay each Member the full amount to which it is entitled, distributions shall be made to each Member on a *pro rata* basis.

(b)     Payments of Business LOC.  The PC Member will process payments received from any property owner for Projects funded by the Business LOC, including but not limited to the Initial business LOC, or otherwise in accordance with the provisions of the Business LOC Documents as follows:

(1)     payments of sums representing reimbursement of the Managing Member for expenses paid by the Initial Business LOC obliged to pay pursuant to the Project LOC Documents shall be paid to the Managing Member;

(2)     payments of points, origination and other fees, and interest shall be paid in pro rata amounts to the Members;

(3)     payments of sums representing any return associated with any equity or other ownership interest the project shall be distributed in equal amounts to the Members;

(4)     Finally, the balance, if any, shall be paid fifty percent (50%) to Managing Member and fifty percent (50%) to PC Member.

## ARTICLE 4
## NOTICES

Section 4.1.    Notices.  All notices, consents, requests for approval, demands, waivers, or other communications (collectively referred to as a "**Notice**") required to be sent or otherwise applicable under this Agreement shall be in writing and shall be sent to each applicable Member, its or their legal counsel at the addresses set forth below.  A Notice that complies with the requirements of this Section shall be deemed to have been duly received: (a) when delivered personally; (b) three (3) Business Days after being mailed, registered or certified mail, return receipt requested and with postage prepaid by the sender; (c) one (1) Business Day after being delivered to a reputable overnight courier service, marked for next day delivery and with delivery charges prepaid by the sender; or (d) on the date of sending by printable document format via e-mail if sent during business hours on a Business Day (otherwise on the next Business Day), if the Notice is also sent by any means described in clause (a), (b) or (c) above.

Section 4.2.    Addresses for Notices.  Notices shall be sent and addressed as follows:

(a)         To the Managing Member:

Berone Capital
3595 Canton Rd, Suite 312-223
Marietta, GA 30066
Attention: Fabian Stone
Email: stone@beronecapital.com

(b)    To PC Member:

Prime Capital Ventures, LLC
66 South Pearl Street, 10th Floor
Albany, NY 12207
Attention: Kris Roglieri
Email: kris@primecommerciallending.com

Section 4.3.    Notice of Deadline. Any Notice given pursuant to this Agreement that sets forth a deadline or other time period within which the recipient must respond shall state in capital letters at the top of the first page of the Notice and, if delivered in an envelope or other container or package, on the envelope or container: "URGENT – CORRESPONDENCE CONTAINS DEADLINE FOR RESPONSE" or words comparable in meaning. The failure of a Notice to comply with the requirement in the preceding sentence shall not, however, affect the validity of the Notice unless the recipient can demonstrate clearly that the failure to so comply was a material factor in the recipient's failure to respond by the deadline stated in the Notice.

Section 4.4.    Change of Address. Each Member and its Permitted Successors shall have the right from time to time and at any time during the term of this Agreement to change its address for Notices or facsimile number by giving Notice of such claim to each other Member as provided in Section 13.2. Each Member shall have the right to specify as its address any other address located within the United States of America.

## ARTICLE 5
## MISCELLANEOUS

Section 5.1.    Entire Agreement. This Agreement constitutes the agreement among the Members pertaining to its subject matter. This Agreement supersedes any prior agreement or understanding among the Members with respect to its subject matter, but shall not amend, modify, supersede or in any way affect any other agreement or understanding among the Members that do not relate to the subject matter of this Agreement.

Section 5.2.    Amendments. No provision of this Agreement may be amended, supplemented or waived except in a written instrument signed by all the Members.

Section 5.3.    Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the Members.

Section 5.4.    No Third Member Beneficiaries. The contribution and indemnification requirements and all other terms and provisions of this Agreement are for the sole and exclusive benefit of the Members and shall not be deemed to create any rights for the benefit of any other Person.

Section 5.5.    Governing Law. This Agreement and the rights of the Members shall be governed by, interpreted, and enforced in accordance with the internal laws of the State of New York without regard to principles of conflicts of laws.

Section 5.6.    Jurisdiction; Choice of Forum. Each Member hereby irrevocably (a) submits to the exclusive jurisdiction of any New York or Federal Court sitting in the County of Albany, in any action or proceeding arising out of or relating to this Agreement, the relations between the Members and any matter, action, or transaction described in this Agreement, (b) agrees that any such courts shall have exclusive jurisdiction over such actions or proceedings, (c) waives the defense of inconvenient forum to the maintenance and continuation of such action or proceeding, (d) consents to the service of any and all process in any such action or proceeding by the mailing of copies (certified mail, return receipt requested and postage prepaid) of such process to them at their addresses specified in Article 4 and (e) agrees that a final and non-appealable judgment rendered by a court of competent jurisdiction in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

Section 5.7.    Binding Arbitration. Any dispute, claim or controversy arising out of or relating to this Agreement, or the breach, termination, enforcement, interpretation, or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by binding arbitration in Albany, NY for the convenience of the Member's principals, before one arbitrator. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures or by ADR Services pursuant to its Arbitration Rules, at the election of the Member initiating the arbitration. The Member initiating a demand for arbitration shall serve Notice of such demand pursuant to the notice requirements set forth in Section 13.2 herein. Within three (3) business days of service of any demand for arbitration, the Members to the dispute shall work cooperatively to mutually select an agreeable arbitrator. If the Members to the dispute are unable to reach agreement on an arbitrator, then the arbitration shall be selected pursuant to the JAMS or ADR Services arbitration selection protocol. Each side shall be entitled to propound one (1) set of requests for production of documents. The requests in each set shall not number more than twenty-five (25) and shall be limited to documents relevant to the issues to be arbitrated. Each side shall further be entitled to notice and take no more than three (3) depositions, which shall last no more than three (3) hours per deponent, including reasonable breaks and objections. No other discovery shall be permitted, except upon a showing of good cause to the arbitrator. Any disputes regarding discovery shall be submitted to and decided by the arbitrator. The prevailing Member shall be entitled to an award of its reasonable costs and expenses, including but not limited to, attorneys' fees, in addition to any other available remedies. Any award rendered therein shall be final and binding on each and all of the Members thereto and their personal representatives, and judgment may be entered thereon in any court of competent jurisdiction. This clause shall not preclude Members from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. Any action or proceeding brought to interpret or enforce this agreement to arbitrate shall be governed by the laws of the State of Delaware. This agreement to arbitrate is intended by the Members to constitute a waiver of any right to trial by jury, or the right to proceed in any state or federal court for resolution of any dispute arising in relation to the enforcement or interpretation of this Agreement, this agreement to arbitrate, any Business Loc Documents, or any Project LOC Documents.

Section 5.8.    WAIVER OF JURY TRIAL.    EACH MEMBER AND EACH OF THEIR PRINCIPALS, FOR ITSELF AND ON BEHALF OF ITS AFFILIATES, HEREBY WAIVES ITS RIGHT TO TRIAL BY JURY IN ANY ACTION, LAWSUIT, OR PROCEEDING RELATING TO ANY DISPUTE ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION DESCRIBED IN THIS AGREEMENT OR DISPUTE BETWEEN THE

MEMBERS (INCLUDING DISPUTES WHICH ALSO INVOLVE OTHER PERSONS).

Section 5.9. **Severability**. If any provision of this Agreement or the application of such provision to any Member or circumstance shall be held invalid or unenforceable, the remainder of this Agreement or the application of that provision to another Member or circumstance shall not be affected thereby.

Section 5.10. **Cumulative Remedies**. Except to the extent expressly stated in this Agreement, (a) no remedy conferred upon the Company or any Member pursuant to this Agreement is intended to be exclusive of any other remedy available under this Agreement or applicable law and (b) each remedy shall be cumulative and shall be in addition to every other remedy available under this Agreement or applicable law now or in the future.

Section 5.11. **Representation by Counsel**. Each Member acknowledges that it has had the opportunity to be represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement. Accordingly, any rule of law or any legal decision that would provide any Member with a defense to the enforcement of the terms of this Agreement against such Member based upon lack of legal counsel, shall have no application and is expressly waived.

Section 5.12. **No Waiver**. No waiver by a Member or the Company of any default, breach or violation of this Agreement shall be deemed to be a waiver of any other default, breach or violation of any kind or nature, whether or not similar to the default, breach or violation that has been waived or failure to enforce a particular provision in one instance shall not be deemed a waiver or modification of rights or preclude the enforcement thereafter. No acceptance of payment or performance by a Member or the Company after any such default, breach or violation shall be deemed to be a waiver of any default, breach or violation of this Agreement, whether or not such Member or the Company knows of such default, breach or violation at the time it accepts such payment or performance. Subject to any applicable statutes of limitation, no failure or delay on the part of a Member or the Company to exercise any right it may have under this Agreement shall prevent its exercise by such Member or the Company, and no such failure or delay shall operate as a waiver of any default, breach or violation of this Agreement.

Section 5.13. **Counterparts**. This Agreement may be executed in several counterparts. If so executed, each such counterpart shall be deemed an original for all purposes and all counterparts shall, collectively, constitute one agreement. In making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart and photocopies may be used.

Section 5.14. **Email Signature**. Any Member may deliver its signature to this Agreement or any Notice or other document described in this Agreement or relating to the Company by email transmission to the proper recipient. Any document signed by a Member by pdf email transmission and reasonably believed by the recipient to have been sent by or on behalf of that Member shall (a) be binding upon and fully enforceable against that Member as though it had delivered a manually-signed counterpart to the recipient, (b) be accepted by any Court as equivalent to a manually-signed counterpart for purposes of any evidentiary rule and (c) no Member will object to the effectiveness or validity of such email signature.

IN WITNESS WHEREOF, each signatory hereto has caused this Agreement to be executed by a duly authorized officer, all as of the day and year first above written.

MANAGING MEMBER:

BERONE CAPITAL

By: *Fabian Stone*
Name: Fabian Stone
Title: Managing Member

PC MEMBER:

PRIME CAPITAL VENTURES, LLC

By: *Kris Roglieri*
Name: Kris Roglieri
Title: CEO