# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF NEW YORK

DEBORAH J. LIVINGSTON and DENA : 
SCROGGINS, individually, and on behalf :
of others similarly situated, :          1:20-cv-1030 (GTS/DJS)
 :
     Plaintiffs, :
 :
v. :
 :
TRUSTCO BANK, A FEDERAL :          JURY TRIAL DEMANDED
SAVINGS BANK, and DOES 1 through :
100, :
 :
     Defendants.

---

## AMENDED CLASS ACTION COMPLAINT

---

Plaintiffs Deborah J. Livingston and Dena Scroggins, by and through their attorneys, bring this class and representative action against Trustco Bank, A Federal Savings Bank and DOES 1 through 100 (collectively "Trustco" or "Defendant").

## NATURE OF THE ACTION

1.    All allegations herein are based upon information and belief except those allegations which pertain to Plaintiffs or their counsel. Allegations pertaining to Plaintiffs or their counsel are based upon, *inter alia*, Plaintiffs' or their counsel's personal knowledge, as well as Plaintiffs' or their counsel's own investigation. Furthermore, each allegation alleged herein either has evidentiary support or is likely to have evidentiary support, after a reasonable opportunity for additional investigation or discovery.

2.    This is a class action brought by Plaintiffs to assert claims in their own right, and in their capacity as the class representatives of all other persons similarly situated. Defendant

wrongfully charged Plaintiffs and the Class Members fees related to their checking accounts.

3.      This class action seeks monetary damages, restitution, and injunctive relief due to, *inter alia*, Defendant's policy and practice to maximize the fees it imposes on members.  This conduct includes but is not limited to, a) assessing an overdraft fee on transactions when by Defendant's own calculations there was enough available money in the checking account to cover the transaction at issue when authorized; and b) assessing more than one insufficient funds fee ("NSF Fee") on the same item.The charging of such fees breaches Defendant's contracts with its members, who include Plaintiffs and the members of the Class.

4.      The charging for such fees also violates federal law.  Defendant failed to follow basic prerequisites in its overdraft fee system as required by Regulation E (12 C.F.R. §§1005.17 *et seq*.) of the Electronic Fund Transfer Act (15 U.S.C.A. §§ 1693 *et seq*.), which include, *inter alia*, providing a separate overdraft fee contract that describes the actual overdraft and non-sufficient funds practice used by Defendant, which may be rejected by the customer, and only collecting fees in the manner described by the fee contract.  Regulation E prohibits Defendant from assessing overdraft fees for automated teller machine (ATM) and non-recurring debit card transactions (12 C.F.R. §1005.17(b)(1)(i)) if it does not meet the Regulation E prerequisites, but Defendant did charge overdraft fees without meeting the Regulation E prerequisite.

## PARTIES

5.      Based on information and belief, Defendant is and has been a federal savings bank with its headquarters located in Glenville, New York, and has assets of more than $5.2 billion, and 148 branch locations in five states. Defendant is a "financial institution" within the meaning of Regulation E (12 C.F.R. § 1005.2(i)).

6.      Plaintiff Livingston is a resident of Celebration, Florida and had a checking account

with Defendant at all times relevant to the class action allegations.

7.    Plaintiff Scroggins is a resident Orange City, Florida and had a checking account with Defendant at all times relevant to the class action allegations.

## VENUE AND JURISDICTION

8.    Venue is proper in this district as Defendant's, among other reasons, pursuant to 28 U.S.C. § 1391(b)(1) because Defendant is a resident of this District.

9.    This Court has jurisdiction over this case, among other reasons, pursuant to 28 U.S.C. § 1331 and § 1332(d).

## FACTUAL ALLEGATIONS

10.    Defendant offers its consumer banking customers a checking account.  One of the features of the checking account is a debit card, which can be used for a variety of transactions including the purchasing of goods and services.  In addition to receiving a debit card, other features of a Trustco checking account include the ability to write checks; withdraw money from ATMs; schedule Automated Clearing House (ACH) transactions; and other types of transactions that debit from a checking account.

11.    Overdraft fees and Non-Sufficient Funds Fees ("NSF" fees) constitute the primary fee generators for banks.  According to a banking industry market research company, Moebs Services, in 2018 alone, banks generated an estimated $34.5 billion from overdraft fees.

12.    Since 2000, the average dollar amount of a checking account transaction has become much lower because customers, and especially younger customers, use debit cards instead of cash or credit cards for everyday purchases.   In 2016, the number of terminals that accept debit

cards in the United States had increased by approximately 1.4 million compared to 2011.[1]   That has translated to the average dollar amount of overdraft transactions being lower than in 2000. However, while the average overdraft transaction is substantially lower and provides much less risk and exposure to the bank, the average cost of overdraft fees per transaction has gone up.

13.   The federal government provides protections to customers with respect to abusive overdraft policies.   In 2010, the Federal Reserve Board enacted regulations giving financial institutions the authority to charge overdraft fees on ATM and one-time debit card transactions only if the institution first obtained the affirmative consent of the customer to do so. (12 C.F.R. § 1005.17 (Regulation E's "Opt-In Rule")).

14.   To qualify as affirmative consent for the Regulation E program, the Opt-In Contract must include, but is not limited, to the following:

- The customer must be provided the overdraft policy, including the dollar amount of any fees that will be charged for an overdraft, and the maximum number of fees that can be assessed on any given day (if there is no maximum, that fact must be stated);

- The financial institution must state whether alternatives, such as linking the checking account to a secondary account or line of credit, are available.

- The opt-in consent must be obtained separately from other consents and acknowledgements;

- The consent cannot serve any purpose other than opting into the overdraft program;

- The consent cannot be a pre-selected checked box;

---

[1] Maria LaMagna, *Debit Cards Gaining on Case for Smallest Purchases,* MarketWatch, Mar. 23, 2016,   http://www.marketwatch.com/story/more-people-are-using-debit-cards-to-buy-a-pack-of-gum-2016-03-23 (last visited March 7, 2019).

- The financial institution may not provide different terms for the account depending on whether the customer opted-in to the overdraft program.

15.     If the financial institution does not obtain proper, affirmative consent from the customer that meets all of the requirements of Regulation E's Opt-in Rule, including fulfilling each of the above requirements, then it is not permitted to charge overdraft fees on ATM and one-time debit card transactions.  On information and belief, although formal discovery will be required to confirm this, Defendant did not fulfill these Regulation E prerequisites. The requirements which it did not fulfill, on information and belief, include, *inter alia*, in its actual Overdraft Protection contract document, failing to correctly describe the program pursuant to which Defendant actually assessed these overdraft fees, failing to abide by its terms, and also using it as an impermissible marketing vehicle.

## I.     TRUSTCO ASSESSES OD FEES ON TRANSACTIONS THAT DO NOT OVERDRAW AN ACCOUNT

### A.   <u>Overview of Claim</u>

16.     Plaintiff brings this action challenging Trustco's practice of charging OD Fees on what are referred to in this Complaint as "Authorize Positive, Purportedly Settle Negative Transactions," or "APPSN Transactions."

17.     At the moment debit card transactions are authorized on an account with positive funds to cover the transaction, Trustco immediately reduces consumers' checking accounts for the amount of the purchase, sets aside funds in a checking account to cover that transaction and the consumers' displayed "available balance" reflects that subtracted amount. As a result, customers' accounts will always have sufficient available funds available to cover these transactions because Trustco has already sequestered these funds for payment.

18.     Despite putting aside sufficient available funds for debit card transactions at the time those transactions are authorized, Trustco later assesses $35.00 OD Fees on those same transactions when they purportedly settle days later into a negative balance. These types of transactions are APPSN Transactions.

19.     Trustco maintains a running account balance, tracking funds consumers have for immediate use. This account balance is adjusted, in real-time, to account for debit card transactions at the precise instance they are made. When a customer makes a purchase with a debit card, Trustco sequesters the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's available balance. Such funds are not available for any other use by the accountholder, and such funds are specifically associated with a given debit card transaction.

20.     When any subsequent intervening transactions are initiated on a checking account, they are compared against an account balance that has already been reduced to account for any earlier debit card transactions. This means that many subsequent transactions incur OD Fees due to the unavailability of the funds sequestered for earlier debit card transactions.

21.     Despite keeping the held funds off-limits for other transactions, Trustco improperly charges OD Fees on those APPSN Transactions, although the APPSN Transactions *always* have sufficient available funds to be covered.

22.     The Consumer Financial Protection Bureau ("CFPB") has expressed concern with this very issue, flatly calling the practice "unfair" and/or "deceptive" when:

> A financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also

posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive. At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing the fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, Supervisory Highlights 9 (Winter 2015), available at https://files.consumerfinance.gov/f/201503_cfpb_supervisory-highlights-winter-2015.pdf.

23.     This abusive practice is not universal in the banking industry. Indeed, major banks like Wells Fargo—one of the largest consumer banks in the country—do not charge OD Fees on APPSN transactions.

24.     There is no justification for these unexpected practices, other than to maximize Trustco's OD Fee revenue. APPSN Transactions only exist because intervening checking account transactions supposedly reduce an account balance. But Trustco is free to protect its interests and either reject those intervening transactions or charge OD Fees on **those** intervening transactions— and it does the latter to the tune of millions of dollars each year. But Trustco was not content with

these millions in OD Fees. Instead, it sought millions *more* in OD Fees on these APPSN Transactions.

25.     Besides being unexpected, deceptive, unfair, and unconscionable, these practices breach contract promises made in Trustco's adhesion contracts—contracts which fundamentally mislead consumers about the true nature of Trustco's processes and practices. These practices also exploit contractual discretion to gouge consumers.

26.     In plain, clear, and simple language, the checking account contract documents covering OD Fees promise that Trustco will only charge OD Fees on transactions that have insufficient funds to cover that transaction. Despite these promises, Trustco regularly charges OD Fees on transactions for which sufficient positive funds were previously sequestered and for which sufficient available funds are always available.

27.     Trustco is not authorized by contract to charge OD Fees on transactions that have not overdrawn an account, but it has done so and continues to do so.

**B.     <u>Mechanics of a Debit Card Transaction</u>**

28.     A debit card transaction occurs in two parts. First, authorization for the purchase amount is instantaneously obtained by the merchant from Trustco. When a merchant physically or virtually "swipes" a customer's debit card, the card terminal connects, via an intermediary, to Trustco, which verifies that the customer's account is valid and that sufficient available funds exist to "cover" the transaction amount.

29.     At this step, if the transaction is approved, Trustco immediately decrements the funds in a consumer's account and sequesters funds in the amount of the transaction but does not yet transfer the funds to the merchant.

30.     Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles. As

discussed in the Federal Register notice announcing revisions to certain provisions of the Truth in Lending Act regulations:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498-01 (Jan. 25, 2009).

31.     Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.

32.     Trustco (like all banks and credit unions) decides whether to "pay" debit card transactions at authorization. After authorization, Trustco is obligated to pay the transaction. For debit card transactions, that moment of decision can only occur at the point of sale, at the instant the transaction is authorized or declined. It is at that point—and only that point—when Trustco may choose either to pay the transaction or to decline it. When the time comes to actually settle the transaction, it is too late—Trustco has no discretion and must pay the charge. This "must pay" rule applies industry-wide and requires that, once a financial institution authorizes a debit card transaction, it "must pay" it when the merchant later makes a demand, regardless of other account activity. *See* Electronic Fund Transfers, 74 Fed. Reg. 59033-01, 59046 (Nov. 17, 2009).

33.     There is no change—no impact whatsoever—to the available funds in an account when this step occurs.

### C.     Trustco's Account Contract

34.     Plaintiff's Trustco checking account is governed by Trustco's Account Agreement and Disclosure ("Account Agreement"), Ex. A, Fee Schedule, Ex. B, and Overdraft Disclosure, Ex. C (collectively, the "Account Documents").

35.     The Account Documents covering OD Fees provide that Trustco will not charge OD Fees on transactions that have sufficient funds to cover them at the time they are initiated.

36.     The Account Agreement states, in part:

AVAILABLE BALANCE—Your available balance is the most current record the bank has of the amount you are able to withdraw from your account…For all debit card purchases, we are permitted to place a temporary hold against some or all of the funds in thr account.  This hold on your account will be subtracted from you available balance.

[…]

ATM/DEBIT CARD—When you use your debit card, the merchant may request authorization for the transaction.  If we confirm there are sufficient funds to cover the transaction, we will automatically place a "hold" on your account for the amount authorized which will reduce the available balance in your account.  As a result, funds in your account subject to the hold will not be available to cover items.

(Emphases added.)

37.      In the Overdraft Disclosure, Trustco states, in part:

We do not <u>authorize and pay</u> overdrafts for the following types of transactions unless you ask us to:

- ATM Transactions
- Everyday debit card transactions.

(emphasis added).

38.     The above promises indicate that transactions are only overdraft transactions when they are authorized into a negative account balance. Of course, that is not true for APPSN transactions, which are authorized and initiated using available funds.  APPSN transactions do not generate an improper OD fee when initiated, yet Trustco charges the fee anyway.

39.     In fact, Trustco actually authorizes transactions on positive funds, sets those funds aside on hold, then fails to use those same funds to settle those same transactions. Instead, it uses the secret posting process described below.  Trustco charges OD Fees even when sufficient funds exist to cover transactions that are authorized into a positive balance. No express language in any document states that Trustco may impose OD Fees on APPSN Transactions.

40.     The Account Documents misstate and mislead with respect to Trustco's true debit card processing and overdraft practices.

41.     First, and most fundamentally, Trustco charges OD Fees on debit card transactions for which there are sufficient funds available to cover the transactions throughout their lifecycle.

42.     Trustco's practice of charging OD Fees even when sufficient available funds exist to cover a transaction violates a contractual promise not to do so.

43.     Next, sufficient funds for APPSN Transactions are actually debited and held from the account immediately, consistent with standard industry practice.

44.     Because these withdrawals take place at authorization, the funds cannot be re-debited later. But that is what Trustco does when its re-debits the account during a secret batching posting process.

45.     Trustco's actual practice is to assay the same debit card transaction twice to determine if the transaction overdraws an account—both at the time a transaction is authorized and later at the time of settlement, but because the sequestered funds are by definition available for the satisfaction of the APPSN transaction, having been set aside for this purpose, there is no reason for this to cause the available balance to become overdrawn and account holders like Plaintiff and members of the OD Class to incur fees.

46.     At the time of settlement, an available balance *does not change at all* for APPSN transactions previously authorized into good funds. As such, Trustco cannot then charge an OD Fee on such transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

47.     Upon information and belief, something more is going on: at the moment a debit card transaction is getting ready to settle, Trustco does something new, undisclosed, and unexpected by its customers during its nightly batch posting process. Specifically, Trustco releases the hold placed on funds for the transaction for a split-second, putting money back into the account, and then re-debits the same transaction a second time.

48.     This secret step allows Trustco to charge OD Fees on transactions that never should have been subject to them—transactions that were authorized into sufficient funds, and for which Trustco specifically set aside money to pay.  Transactions that should not have affected the available balance as the funds had already been deducted from the available balance.

49.     This discrepancy between Trustco's actual practices and the contract causes accountholders to incur more OD Fees than they should.

50.     In sum, there is a huge gap between Trustco's practices as described in the Account Documents and Trustco's practices in reality.

51.     Financial institutions like Trustco that employ this abusive APPSN fee practice know how to plainly and clearly disclose it and require their accountholders to agree to the practice expressly—something Trustco never did here.

52.     Indeed, recognizing the complexity of the APPSN process and the fact that a fee in such a circumstance is counterintuitive to accountholders, the industry generally provides an

express warning and example that APPSN fees can occur, and how. Plaintiff provides examples

from large, medium, and small financial institutions below.

53.     For example, Bank of America's Deposit Agreement states:

Debit card transactions and related authorization holds may impact your available balance. It is important to know that your available funds may change between the time you authorize a transactions and when the transaction is paid...The amount being held is not applied to the debit card transaction...If other account activity has caused the funds available in your account to drop below zero before the debit card transaction is paid, you may no longer have sufficient funds to pay the merchant...Here is an example of how that may happen: On Monday we authorize a debit card transaction because you have enough available funds at the time. A hold is then placed on your funds until the merchant presents the transaction for payment. On Tuesday we process and post another transaction (such as a check you wrote) that reduces your available funds below zero. If the merchant presents the original debit card transaction for payment on Wednesday, and your available funds are now below the amount needed to pay the transactions, the debit card transaction will overdraw your account and you may incur an overdraft fee.

https://www.bankofamerica.com/deposits/resources/deposit-agreements.go.

54.     Capital One's Deposit Agreement states:

Other intervening transactions that occur while authorized debit card transactions are pending may create overdrafts on your account. Here is an example of how that could happen:

You're enrolled in our optional overdraft service. Your account balance is $100.00. On Monday, you go to the store and use your debit card to make a purchase for $80.00. We authorize the transaction; however, the merchant doesn't send us the transaction for payment and posting to your account on that day. On Tuesday, you withdraw $30.00 from an ATM, reducing your account balance to $70. On Wednesday, the merchant requests payment for the $80.00 transaction authorized on Monday, and you're charged a fee because the balance in your account is insufficient to pay the transaction at that time.

https://www.capitalone.com/bank/rules-governing/disclosures/.

55.     As another example, Canvas Credit Union states:

Available balance at the time transactions are posted (**not when they are authorized**) may be used to determine when your account is overdrawn. The following example illustrates how this works:

13

Assume your actual and available balance are both $100, and you swipe your debit card at a restaurant for $60. As a result, your available balance will be reduced by $60 so your available balance is only $40. Your actual balance is still $100. Before the restaurants charge is sent to us for posting, a check that you wrote for $50 clears. Because you have only $40 available...your account will be overdrawn by $10, even though your actual balance was $100 before the check posted...**Also**, when the $60 restaurant charge is presented to the Canvas and posted to your account, you will not have enough money in your available balance because of the intervening check, and you will be charged a fee for that transaction as well, even though your available balance was positive when it was authorized.

https://cdn.canvas.org/files/content/pdf/MSA Part 2-CanvasCU-Std Size-11-05-19.pdf

(emphases in original).

###    D.    Plaintiffs' Debit Card Transactions

56.    As examples, on January 9, 2019, January 10, 2019, March 5, 2019, and October 2, 2018, and September 19, 2018, Plaintiff Livingston was assessed $36 OD Fees in the amount of $30.00 for debit card transactions that settled on those days. However, those transactions were authorized and paid into a <u>positive</u> available balance prior to those days. Further, at that time of those authorizations, positive funds were deducted immediately for the debit card transactions on which Plaintiff Livingston was later assessed OD Fees.

57.    As examples, on January 9, 2019, January 10, 2019, March 5, 2019, and October 2, 2018, and September 19, 2018, Plaintiff Livingston was assessed $36 OD Fees in the amount of $30.00 for debit card transactions that settled on those days. However, those transactions were authorized and paid into a positive available balance prior to those days. Further, at that time of those authorizations, positive funds were deducted immediately for the debit card transactions on which Plaintiff Livingston was later assessed OD Fees.

58.    The same pattern occurred with respect to Plaintiff Scroggins.  As examples, on October 30, 2019, January 3, 2020, and November 10, 2020, Plaintiff Scroggins was assessed $36 insufficient funds fees for debit card transactions that settled on those days. However, those

14

transactions were authorized and paid into a <u>positive</u> available balance prior to that day. Further, at that time of those authorizations, positive funds were deducted immediately for the debit card transactions on which Plaintiff was later assessed OD Fees.

## II.   TRUSTCO ASSESSES MORE THAN ONE NSF FEE ON THE SAME ITEM

59.    Trustco regularly assesses two or more NSF Fees on the *same* electronic payment or check.

60.    This abusive practice is not universal in the financial services industry. Indeed, major banks like Chase—the largest consumer bank in the country—does not undertake the practice of charging more than one NSF Fee on the same electronic payment or check when it is reprocessed. Instead, Chase charges one NSF Fee even if a electronic payment or check. is resubmitted for payment multiple times.

61.    Trustco's Account Documents never disclose this practice. To the contrary, Trustco's Account Documents indicate it will only charge a single NSF Fee on an electronic payment or check.

### A.   Plaintiff Scroggins' Experience

62.    In support of her claims, Plaintiff Scroggins offers an example of NSF Fees that should not have been assessed against her checking account. As alleged below, Trustco: (a) reprocessed a previously declined item; and (b) charged a fee upon reprocessing.

63.    On April 8, 2020, Plaintiff Scroggins attempted a single payment via ACH.

64.    Trustco rejected payment of that payment due to insufficient funds in Plaintiff's account and charged her a $36 NSF Fee for doing so. Plaintiff Scroggins does not dispute the initial fee, as it is allowed by Trustco Account Documents.

65.    Six days later, on April 14, 2020, Trustco again processed the payment, but this

time paid it into insufficient funds and charged an OD Fee in the amount of $36.

66.     Trustco knew the second processing attempt was of the same payment, because it labelled the second processing attempt a RETRY PAYMENT on the bank statement it provided to Plaintiff Scroggins.

67.     In sum, Trustco charged Plaintiff Scroggins $72 in fees to attempt to process a single payment.

**B.    The Imposition of Multiple Fees on a Single Payment Violates the Contract**

68.     The Account Documents provide the general terms of Plaintiffs' relationship with Trustco and therein Trustco makes explicit promises and representations regarding how transactions will be processed, as well as when NSF Fees and OD Fees may be assessed.

69.     The Account Documents contain explicit terms indicating that fees will only be assessed once per item—defined as a customer request for payment or transfer—when in fact Trustco regularly charges two or more fees per electronic payment or check.

70.     Trustco's Account Documents indicate that a singular NSF Fee can be assessed on checks, ACH debits, and electronic payments.

71.     Trustco's Account Documents state that it will charge a single fee per item returned due to insufficient funds.

72.     The Fee Schedule states:

Overdraft/Insufficient Funds Fee (Paid or Returned)   $36

(No more than 5 fees per day)

You will not be charged a **per item fee** when your account is overdrawn $5 of less on person accounts only. (emphasis added).

73.     The same payment cannot conceivably become a new one each time it is rejected

for payment then reprocessed, especially when—as here—Plaintiff took no action to resubmit it.

74.     There is zero indication anywhere in the Account Documents that the same payment  is eligible to incur multiple NSF Fees.

75.     Even if Trustco reprocesses an instruction for payment, it is still the same payment. Trustco's reprocessing is simply another attempt to effectuate an accountholder's original order or instruction.

76.     Banks and credit unions, like Trustco, that employ this abusive practice know also how to plainly and clearly disclose it. Indeed, other banks and credit unions that do engage in this abusive practice disclose it expressly to their accountholders—something Trustco never did here.

77.     For example, First Hawaiian Bank engages in the same abusive practices as PCU, but at least currently discloses it in its online banking agreement, in all capital letters, as follows:

YOU AGREE THAT MULTIPLE ATTEMPTS MAY BE MADE TO SUBMIT A RETURNED ITEM FOR PAYMENT AND THAT **MULTIPLE FEES MAY BE CHARGED TO YOU AS A RESULT OF A RETURNED ITEM AND RESUBMISSION**.

*Terms and Conditions of FHB Online Services*, First Hawaiian Bank 40, https://www. fhb.com/ en/assets/File/Home_Banking/FHB_Online/Terms_and_Conditions_of_FHB_Online_Services_ RXP1.pdf (last accessed September 25, 2019) (emphasis added).

78.     Klein Bank similarly states in its online banking agreement:

[W]e will charge you an NSF/Overdraft Fee each time: (1) a Bill Payment (electronic or check) is submitted to us for payment from your Bill Payment Account when, at the time of posting, your Bill Payment Account is overdrawn, would be overdrawn if we paid the item (whether or not we in fact pay it) or does not have sufficient available funds; or (2) we return, reverse, or decline to pay an item for any other reason authorized by the terms and conditions governing your Bill Payment Account. **We will charge an NSF/Overdraft**

**Fee as provided in this section regardless of the number of times an item is submitted or resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the bill payment.**

*Consumer and Small Business Online Access Agreement*, Klein Bank ¶ H, https://www.kleinbankonline.com/bridge/disclosures/ib/disclose.html (last accessed September 25, 2019) (emphasis added).

79.     Central Pacific Bank, a leading bank in Hawai'i, states in its Fee Schedule under the "MULTIPLE NSF FEES" subsection:

> Items and transactions (such as, for example, checks and electronic transactions/payments) returned unpaid due to insufficient/non-sufficient ("NSF") funds in your account, may be resubmitted one or more times for payment, and a $32 fee will be imposed on you each time an item and transaction resubmitted for payment is returned due to insufficient/nonsufficient funds.

*Miscellaneous Fee Schedule*, Central Pacific Bank 1 (Feb. 15, 2019), https://www.centralpacificbank.com/PDFs/Miscellaneous-Fee-Schedule.aspx.

BP Credit Union likewise states: "We may charge a fee each time an item is submitted or resubmitted for payment; therefore, you may be assessed more than one fee as a result of a returned item and resubmission(s) of the returned item."

80.     Regions Bank likewise states:

> If an item is presented for payment on your account at a time when there is an insufficient balance of available funds in your account to pay the item in full, you agree to pay us our charge for items drawn against insufficient or unavailable funds, whether or not we pay the item. If any item is presented again after having previously been returned unpaid by us, you agree to pay this charge for each time the item is presented for payment and the balance of available funds in your account is insufficient to pay the item.

https://www.regions.com/virtualdocuments/Deposit_Agreement_6_1_2018.pdf.

81.     First Financial Bank states, "Merchants or payees may present an item multiple times for payment if the initial or subsequent presentment is rejected due to insufficient funds or other reason (representment). Each presentment is considered an item and will be charged accordingly." Special Handling/Electronic Banking Disclosures of Charges, First Financial Bank 2 (Aug. 2018), https://www.bankatfirst.com/content/dam/first-financial-bank/eBanking_Disclosure _of_ Charges.pdf.

82.     Andrews Federal Credit Union states:

You understand and agree that a merchant or other entity may make multiple attempts to resubmit a returned item for payment. Consequently, because we may charge a service fee for an NSF item each time it is presented, we may charge you more than one service fee for any given item. Therefore, multiple fees may be charged to you as a result of a returned item and resubmission regardless of the number of times an item is submitted or resubmitted to use for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the item. When we charge a fee for NSF items, the charge reduces the available balance in your account and may put your account into (or further into) overdraft.

https://www.andrewsfcu.org/AndrewsFCU/media/Documents/Terms-and-Conditions_REBRANDED_Dec2019-Update.pdf

83.     Consumers Credit Union states:

Consequently, because we may charge a service fee for an NSF item each time it is presented, we may charge you more than one service fee for any given item. Therefore, multiple fees may be charged to you as a result of a returned item and resubmission regardless of the number of times an item is submitted or resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the item.

19

https://www.myconsumers.org/docs/default-source/default-document-library/ccu_membership_booklet_complete.pdf?sfvrsn=6

84.     Wright Patt Credit Union states:

Consequently, because we may charge a service fee for an NSF item each time it is presented, we may charge you more than one service fee for any given item. Therefore, multiple fees may be charged to you as a result of a returned item and represented regardless of the number of times an item is presented or represented to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the item.

https://www.wpcu.coop/en-us/PDFDocuments/Important%20Account%20Information%20Disclosure%20-%20WPCU.pdf
Railroad & Industrial Federal Credit Union states,

Consequently, because we may charge an NSF fee for an NSF item each time it is presented, we may charge you more than one NSF fee for any given item. Therefore, multiple fees may be charged to you as a result of a returned item and resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the item.

https://www.rifcu.org/Documents/Disclosures/Account-Terms-Conditions.aspx

85.     Partners 1st Federal Credit Union states.

Consequently, because we may charge a fee for an NSF item each time it is presented, we may charge you more than one fee for any given item. Therefore, multiple fees may be charged to you as a result of a returned item and resubmission regardless of the number of times an item is submitted or resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the item.

https://www.partners1stcu.org/uploads/page/Consumer_Account_Agreement.pdf

86.     Members First Credit Union states,

We reserve the right to charge an Non-Sufficient Funds Fee (NSF Fee) each time a transaction is presented if your account does not have sufficient funds to cover the transaction at the time of presentment and we decline the transaction for that reason. **This means that a transaction may incur more than one Non-Sufficient Funds Fee (NSF Fee) if it is presented more than once** . . . we reserve the right to charge a Non-Sufficient Funds (NSF Fee) for both the original presentment and the representment [.]

http://www.membersfirstfl.org/files/mfcufl/1/file/Membership_and_Account_Agreement.pdf

87.     Community Bank, N.A. states,

We cannot dictate whether or not (or how many times) a merchant will submit a previously presented item. You may be charged more than one Overdraft or NSF Fee if a merchant submits a single transaction multiple times after it has been rejected or returned.

https://cbna.com/u/header/2019-Overdraft-and-Unavailable-Funds-Practices-Disclosure.pdf

88.     RBC Bank states,

We may also charge against the Account an NSF fee for each item returned or rejected, including for multiple returns or rejections of the same item.

https://www.rbcbank.com/siteassets/Uploads/pdfs/Service-Agreement-for-Personal-Accounts.pdf

89.     Diamond Lakes Credit Union states,

Your account may be subject to a fee for each item regardless of whether we pay or return the item. We may charge a fee each time an item is submitted or resubmitted for payment; therefore, you may be assessed more than one fee as a result of a returned item and resubmission(s) of the returned item.

https://www.diamondlakesfcu.org/termsconditions.html

90.     Parkside Credit Union states,

If the Credit Union returns the item, you will be assessed an NSF Fee. Note that the Credit Union has no control over how many times an intended payee may resubmit the same check or other item to us for payment. In the event the same check or other item is presented for payment on more than one occasion, your account will be subject to an additional charge on each occasion that the item is presented for payment. There is no limit to the total fees the Credit Union may charge you for overdrawing your account.

https://www.parksidecu.org/_/kcms-doc/1043/44277/Membership-and-Account-Agreement.pdf?__cf_chl_captcha_tk__=add6ebea42df3385074decd4b16c1f86a8369dc9-1580427763-0-AfXmB7FcyYTqzK9oMNbMSKM6k5fnKS5Xf-z7p3Tv-Pt951tDs7wM8yaaIV06w718t2nomyWR1Q8COwgpfgE07FJWZUeFkJN6lxbXDZG1SvidTWhYm9l85AbCd5afw2imyGdtdzKhXl9bQ9TYkjOlTVM4w8OFJOtE3wVIHrEITnQnSfoR5mZxM5O0bu4f_FHoHiJj0XsjNkVoGblk0-lti6-gMn-Wcu_o87SGQW6dOUF2i6rHGiM_CkdI-ULanKI2NS3KlhkYAuNatN9Jdwr7Plc6oJozMbZQeczuO7VlbRnuCFD0tjzkw1lsnof7uaRvLRAkfKYi3wh0tUU1c_Y6N4aH1qN8SPftOn8TYJHO7OoILvpMfamNTqv_djpbUl3GVA

Trustco provides no such disclosure, and in so doing, deceives its accountholders.

91.     Further, in or about late August 2020 to September 2020, Trustco breached and mishandled the operation of its software system meant to be utilized by its bank customers for electronic transactions, such that the custumers were unable to electronically access their own accounts to cancel or reschedule or otherwise arrange or rearrange payments. Thereby Trustco caused multiple additional non-sufficient funds or overdraft fees to be imposed on its customers. When Trustco's employees were asked why this access to the customer's accounts was not functioning, Trustco responded it was in the midst of some sort of software transition or change and that this was happening across its system to Trustco customers.

92.     Plaintiffs and the Class Members have performed all conditions, covenants, and promises required by each of them in accordance with the terms and conditions of the contracts.

Plaintiffs did not and could not have, exercising reasonable diligence, discovered both that they had been injured and the actual cause of that injury until they met with their attorneys in or about July 2020. While Plaintiffs understood that they were assessed fees, they did not understand the cause of those fees until about July 2020, because Defendant hid its actual practice from its members by describing a different practice in its contracts. It also mis-labeled fees and made it next to impossible for a reasonable person to understand which fees applied to which transactions or were authorized, or that Defendant had violated obscure federal laws, including Regulation E. This not only reasonably delayed discovery, but Defendant's affirmative representations and actions also equitably toll any statute of limitations, and also additionally equitably estop Defendant.

93. Plaintiffs and the class members were harmed by these practices when they were assessed such fees when they should not have been. A complete evaluation of Defendant's records is necessary to determine the full extent of Plaintiffs' harm from this practice.

94. Plaintiffs bring this case, and each of their respective causes of action, as a class action pursuant to Federal Rule of Civil Procedure 23(a)(b)(1), (b)(2) and (b)(3) on behalf of the following class.

**Class One:  The APPSN Class**

> **All United States residents who have or have had accounts with Trustco who incurred an overdraft fee on a transaction that was authorized into a positive available balance beginning six years preceding the filing of the Original Complaint and ending on the day the class certification is granted.**

**Class Two:  The Regulation E Class**

> **All United States residents who have or have had accounts with Trustco who incurred an overdraft fee or overdraft fees for ATM or non-recurring debit card transaction(s) during the period beginning August 15, 2010 and ending on the day the class certification is granted.**

**Class Three:  The Multiple Fee Class**

> **All United States residents who have or have had accounts with Trustco who incurred more than one overdraft fee or insufficient funds fee on the same electronic payment or check beginning six years preceding the filing of this Complaint and ending on the day the class certification is granted.**

**Class Four:  The Additional Fees Caused By Disabled Account Access Class**

> **All United States residents who have or have had accounts with Trustco who incurred an overdraft fee or insufficient funds fee arising from Trustco's mishandling of its electronic banking system in approximately August – September 2020.**

95.     Excluded from the Classes are: (1) any entity in which Defendant has a controlling interest; (2) officers or directors of Defendant; (3) this Court and any of its employees assigned to work on the case; and (4) all employees of the law firms representing Plaintiffs and the Class Members.

96.     Plaintiffs can identify and ascertain all other class members from Defendant's business records. Upon information and belief, Defendant has databases, and/or other documentation, of its customers' transactions and account enrollment.  These databases and/or documents can be analyzed by an expert to ascertain which of Defendant's members have been harmed by its practices and thus qualify as Class Members.  Further, the Class definition identifies groups of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify himself or herself as having a right to recover.  Other than by direct notice by mail or email, alternatively proper and sufficient notice of this action may be provided to the Class Members through notice published in newspapers or other publications. Thus, Plaintiffs' classes are ascertainable.

97.     **Numerosity** – Plaintiffs do not know the exact size of the class because this

information is in Defendant's exclusive control. However, based on Trustco having assets of more than $5.2 billion, and 148 branch locations in five states, numerosity will be met, and joinder of all class members would be impracticable.

98.     **Typicality** – Plaintiffs' claims are typical of all of the members of the Class.  The evidence and the legal theories regarding Defendant's alleged wrongful conduct committed against Plaintiffs and all of the Class Members are substantially the same because all of the relevant agreements between Defendant and its customers, including the Account Agreement and Opt-In Contract, were identical as to all relevant terms, and also because, inter alia, the challenged practices of charging customers for improper fees are uniform for Plaintiffs and all Class Members. Accordingly, in pursuing their own self-interest in litigating their claims, Plaintiffs will also serve the interests of the other Class Members.

99.     **Commonality** – Questions of law and fact common to the Class(es) exist and predominate over questions affecting only individual members, including, inter alia, the following:

a.   Whether the Account Agreement contracted for Defendant to charge an overdraft/NSF fee based on an APPSN calculation or multiple fees on the same electronic payment or check;

b.   Whether the Opt-In Contracted was ambiguous on whether Defendant would use an APPSN calculation for assessing overdraft/NSF fees;

c.   Whether Defendant abided by its funds availability policy;

d.   Whether the contracts are ambiguous on what fees will be charged under what circumstances, or referred to inconsistently;

e.   Whether Defendant complied with Regulation E.

f.   Whether Trustco was responsible for a failure in its electronic banking system in

approximately August – September 2020 which caused its customers to suffer additional NSF and overdraft fees.

100.    **Adequacy** – Plaintiffs will fairly and adequately protect the interests of the Class Members. Plaintiffs have retained competent counsel experienced in class action litigation to ensure such protection.  There are no material conflicts between the claims of the representative Plaintiffs and the members of the Class that would make class certification inappropriate. Plaintiffs and their counsel intend to prosecute this action vigorously.

101.    **Predominance and Superiority** – The matter is properly maintained as a class action under Federal Rule of Civil Procedure 23(b)(3) because the common questions of law or fact identified herein and to be identified through discovery predominate over questions that may affect only individual Class Members.  Further, the class action is superior to all other available methods for the fair and efficient adjudication of this matter.  Because the injuries suffered by the individual Class Members are relatively small, the expense and burden of individual litigation would make it virtually impossible for Plaintiffs and Class Members to individually seek redress for Defendant's wrongful conduct.  Even if any individual person or group(s) of Class Members could afford individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed.  The class action device is preferable to individual litigation because it provides the benefits of unitary adjudication, economies of scale, and comprehensive adjudication by a single court.  In contrast, the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for the party (or parties) opposing the Class and would lead to repetitious trials of the numerous common questions of fact and law.  Plaintiffs know of no difficulty that will be encountered in the management of this

litigation that would preclude its maintenance as a class action.  As a result, a class action is superior to other available methods for the fair and efficient adjudication of this controversy. Absent a class action, Plaintiffs and the Class Members will continue to suffer losses, thereby allowing Defendant's violations of law to proceed without remedy and allowing Defendant to retain the proceeds of their ill-gotten gains.

102.    Plaintiffs do not believe that any other Class Members' interest in individually controlling a separate action is significant, in that Plaintiffs have demonstrated above that their claims are typical of the other Class Members and that they will adequately represent the Class. This particular forum is a desirable forum for this litigation because Defendant resides in this District. Plaintiffs do not foresee significant difficulties in managing the class action in that the major issues in dispute are susceptible to class proof.

103.    Plaintiffs anticipate the issuance of notice, setting forth the subject and nature of the instant action, to the proposed Class Members.  Upon information and belief, Defendant's own business records and/or electronic media can be utilized for the contemplated notices.  To the extent that any further notices may be required, Plaintiffs anticipate the use of additional media and/or mailings.

104.    This matter is properly maintained as a class action pursuant to Rule 23(b) of the Federal Rules of Civil Procedure in that:

      a. Without class certification and determination of declaratory, injunctive, statutory and other legal questions within the Class format, prosecution of separate actions by individual members of the Class will create the risk of:

           1. Inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards

of conduct for the parties opposing the Class; or

2.  Adjudication with respect to individual members of the Class, which would as a practical matter be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests. The parties opposing the Class have acted or refused to act on grounds generally applicable to each member of the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Class as a whole.

b.  Common questions of law and fact exist as to the members of the Class and predominate over any questions affecting only individual members, and a class action is superior to other available methods of the fair and efficient adjudication of the controversy.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

105.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

106.    Plaintiffs and each of the Class Members entered into an Account Agreement with Defendant covering the subject of overdraft transactions.  This contract was drafted by and is binding upon Defendant.

107.    Nowhere did the Account Agreement state that Defendant would sequester money upon authorization for a transaction and not allow it to be used for anything else, but then charge an overdraft fee at the time of the posting of the same transaction when there had been enough money to cover the transaction when the money had been sequestered for it.  Further, in the

28

contracts Defendant promised that it would assess fees only when the transaction caused the available balance to fall below zero.  Additionally, the operative contracts governed which fees could be charged and under which circumstances, and Defendant breached these contracts by charging fees under circumstances not permitted by the contracts, including more than one fee for the same item. Further, Trustco breched its contracts in approximately August and September 2020 by mishandling or impeding customers' ability to access their own electronic banking transactions and thereby caused further fees to occur.

108.    Plaintiffs and the Class Members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the Account Agreement, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

109.    As a proximate result of Defendant's breaches, Plaintiffs and the Class Members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

<u>**SECOND CAUSE OF ACTION**</u>
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

110.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

111.    Plaintiffs and each of the Class Members entered into contracts with Defendant covering the subject of overdraft transactions, which has been identified herein as the Account Agreement contract which covers overdraft fees and NSF fees. The contracts were drafted by and are binding upon Defendant.  Nowhere in its contracts did Defendant state that it would sequester funds for a transaction and thereby reduce the "available balance" by the amount of sequestered funds, yet nonetheless charge a fee at the time of the positing of the transaction despite already

having set those funds aside. Nowhere did Defendant state it would charge more than one fee for the same item. Nowhere did Defendant state it would impede or disable access to its customers' electronic transactions so as to cause them further fees.

112. Good faith is an element of every contract. Whether by common law or statute, all contracts impose upon each party a duty of good faith and fair dealing. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Thus, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms, constitute examples of bad faith in the performance of contracts.

113. The material terms of the contracts therefore included the implied covenant of good faith and fair dealing, whereby Defendant covenanted that it would, in good faith and in the exercise of fair dealing, deal with Plaintiffs and each Class member fairly and honestly and do nothing to impair, interfere with, hinder, or potentially injure Plaintiffs' and the Class Members' rights and benefits under the contracts.

114. Plaintiffs and the Class Members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the contract, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

115. Defendant breached the implied covenant of good faith and fair dealing based, *inter alia*, when after sequestering funds for a particular transaction and not making them available for any other use, Defendant nonetheless at the time of posting charged an overdraft fee on that same transaction for which funds already had been set aside. Defendant unilaterally elected to and did

program its software to create this accounting gimmick which would maximize its overdraft and NSF fees.  Defendant further breached the implied covenant of good faith by electing to charge more than one fee for the same item, when it easily could have programmed its software to not do so.  Further, Defendant could have allowed its customers access to their own electronic transactions rather than impede or disable that ability, or could have avoided profiting from its own wrongdoing by not charging customers additional fees arising from the lack of access to the accounts caused by Defendant. In so doing, and in implementing its overdraft and NSF fee programs for the purpose of increasing and maximizing overdraft fees, Defendant executed its contractual obligations in bad faith, depriving Plaintiffs and the Class Members of the full benefit of the contracts.

116.    As a proximate result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiffs and the Class Members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

### THIRD CAUSE OF ACTION
**(Unjust Enrichment/Restitution)**

117.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

118.    As a result of the wrongful misconduct alleged above, Defendant unjustly received millions of dollars in overdraft and NSF fees.

119.    Because Plaintiffs and the Class Members paid the erroneous overdraft and NSF fees and repeat NSF and other fees assessed by Defendant, Plaintiffs and the Class Members have conferred a benefit on Defendant, albeit undeservingly.  Defendant has knowledge of this benefit, as well as the wrongful circumstances under which it was conveyed, and yet has voluntarily accepted and retained the benefit conferred.  Should it be allowed to retain such funds, Defendant

would be unjustly enriched.  Therefore, Plaintiffs and the Class Members seek relief as set forth in the Prayer below.

## FOURTH CAUSE OF ACTION
### (Money Had and Received)

120.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

121.    Defendant has obtained money from Plaintiffs and the Class Members by the exercise of imposition, coercion, undue influence, menace or threat, compulsion or duress, and/or mistake of law and/or fact.

122.    As a result, Defendant has in its possession money which, in equity, belongs to Plaintiffs and the Class Members, and thus, this money should be refunded to Plaintiffs and the Class Members.  Therefore, Plaintiffs and the Class Members seek relief as set forth in the Prayer below.

## FIFTH CAUSE OF ACTION
### (Violation of Electronic Fund Transfers Act (Regulation E)
### C.F.R. § 1005 et seq.  (authority derived from 15 U.S.C. § 1693 et seq.))

123.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

124.    By charging overdraft fees on ATM and nonrecurring transactions, Defendant violated Regulation E (12 C.F.R. §§1005 *et seq*.), whose "primary objective" is "the protection of consumers" (§1005.1(b)) and which "carries out the purposes of the [Electronic Fund Transfer Act (15 U.S.C. §§1693 *et seq*.), the "EFTA"] (§1005.1(b)), whose express "primary objective" is also "the provision of individual consumer rights" (15 U.S.C. §1693(b)).

125.    Specifically, the charges violated what is known as the "Opt-In Rule" of Reg E. (12 C.F.R. §1005.17.)  The Opt-In Rule states:  "a financial institution ... *shall not assess a fee or*

*charge* ... pursuant to the institution's overdraft service, *unless* the institution:  (i) [p]rovides the consumer with a notice in writing [the opt-in notice]... *describing the institution's overdraft service*"  and (ii) "[p]rovides a reasonable opportunity for the consumer to *affirmatively consent*" to enter into the overdraft program (*Id*.)  The notice "shall be clear and readily understandable." (12 C.F.R. §205.4(a)(1).)  To comply with the affirmative consent requirement, a financial institution must provide a segregated description of its overdraft practices that is accurate, non-misleading and truthful and that conforms to 12 C.F.R. § 1005.17 prior to the opt-in, and must provide its customers a reasonable opportunity to opt-in after receiving the description.  The affirmative consent must be provided in a way mandated by 12 C.F.R. § 1005.17, and the financial institution must provide confirmation of the opt-in in a manner that conforms to 12 C.F.R. § 1005.17.

126.   The intent and purpose of this Opt-In Contract is to "assist customers in understanding <u>how</u> overdraft services provided by their institutions <u>operate</u> .... by <u>explaining</u> the institution's overdraft service ... in a <u>clear and readily understandable way</u>"—as stated in the Official Staff Commentary (74 Fed. Reg. 59033, 59035, 59037, 5940, 5948), which is "the CFPB's official interpretation of its own regulation," "warrants deference from the courts unless 'demonstrably irrational,'" and should therefore be treated as "a definitive interpretation" of Reg E.  *Strubel v. Capital One Bank (USA)*, 2016 U.S. Dist. LEXIS 41487, *11 (S.D. N.Y. 2016) (quoting *Chase Bank USA v. McCoy*, 562 U.S. 195, 211 (2011)) (so holding for the CFPB's Official Staff Commentary for the Truth In Lending Act's Reg Z).

127.   Defendant failed to comply with Regulation E, 12 C.F.R. § 1005.17, which requires affirmative consent before a financial institution is permitted to assess overdraft fees against customer's accounts through an overdraft program for ATM and non-recurring debit card

transactions.  Defendant has failed to comply with the 12 C.F.R. § 1005.17 opt-in requirements, including *inter alia* failing to provide its customers with a valid description of the overdraft program which meets the strictures of 12 C.F.R. § 1005.17.  It did not in its Opt-In contract describe in a "clear and readily understandable way" that it would be using its APPSN accounting gimmick to assess overdraft fees on ATM and debit card transactions.

128.    As a result, Defendant has harmed Plaintiffs and the Class.

129.    Due to Defendant's violation of Regulation E (12 C.F.R. § 1005.17), Plaintiffs and members of the Class are entitled to actual and statutory damages, as well as attorneys' fees and costs of suit.

## SIXTH CAUSE OF ACTION
### (For Violation of New York General Business Law § 349)

130.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

131.    By the actions alleged above, Defendant has engaged in deceptive acts or practices against Plaintiffs and the Class members in violation of New York General Business Law § 349 ("GBL").

132.    Defendant stated it would only charge overdraft (or NSF) fees against its customers when their accounts did not contain enough available funds in them than was called for by a given transaction.  In reality, Defendant would sequester these funds for a transaction when enough were available for a transaction without going negative, but charged Plaintiffs and the Class Members overdraft (and/or NSF fees) when the transaction with the sequestered funds would post.

133.    This practice is deceptive because, *inter alia*, Defendant promised Plaintiffs and the Class members that it would only assess overdraft or NSF fees where the transaction at issue exceeded the actual amount of money in the customer's account, but instead charged fees when the account contained enough money to pay for the transaction in question.  Further, Defendant Defendant's conduct was not motivated by any legitimate business or economic need or rationale.

34

The harm and adverse impact of Defendant's conduct on members of the general public was neither outweighed nor justified by any legitimate reasons, justifications, or motives. The harm to Plaintiffs and Class Members arising from Defendant's unfair practices relating to the imposition of the improper fees outweighs the utility, if any, of those practices.

134.     Plaintiffs alleges that this conduct already has been found by the Consumer Financial Protection Bureau to be both "unfair" and deceptive:"

> A financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged.  Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive. At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions.  Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status.  But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures.  Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive.  Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, Winter 2015 "Supervisory Highlights".

135.     The practice described in this cause of action was consumer-oriented.  Defendant issued its Account Agreement to all members of the public seeking to become customers of Defendant.  Further, the contracts were made available to the public on Defendant's website.

136.     Plaintiffs suffered harm from these practices when they were assessed wrongful overdraft and NSF fees.

137.     Under § 349(h) Plaintiffs and the Class are entitled to damages and other relief in a form and amount to be determined by a court of law.

## PRAYER

WHEREFORE, Plaintiffs and the Class pray for judgment as follows:

1. For an order certifying this action as a class action;

2. For compensatory damages on all applicable claims and in an amount to be proven at trial;

3. For an order requiring Defendant to disgorge, restore, and return all monies wrongfully obtained together with interest calculated at the maximum legal rate;

4. For treble damages;

5. For statutory damages;

6. For an order enjoining the wrongful conduct alleged herein;

7. For costs;

8. For pre-judgment and post-judgment interest as provided by law;

9. For attorneys' fees under New York General Business Law § 349, the common fund doctrine, and all other applicable law and sources; and,

10. For such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs and the Class Members demand a trial by jury on all issues so triable.


Dated: April 26, 2021

Respectfully submitted,

**CHERUNDOLO LAW FIRM, PLLC**

BY:     *s/ John C. Cherundolo*
         John Cherundolo
         Bar Roll No. 101339
         J. Patrick Lannon
         Bar Roll No. 516843
         AXA Tower I, 15th Floor
         100 Madison Street
         Syracuse, New York 13202
         Telephone (315) 449-9500
         Facsimile (315) 449-9804
         *plannon@cherundololawfirm.com*

**THE KICK LAW FIRM, APC**
Taras Kick, CA Bar No. 143379 (*pro hac vice*)
Jeffrey C. Bils, CA Bar No. 301629 (*pro hac vice*)
815 Moraga Drive
Los Angeles, California 90049
Telephone: (310) 395-2988
Facsimile: (310) 395-2088
*Taras@Kicklawfirm.com*
*jeff@kicklawfirm.com*

**WILENTZ, GOLDMAN & SPITZER, P.A.**
Kevin P. Roddy, Bar Roll No. 520400
90 Woodbridge Center Drive, Suite 900
Woodbridge, NJ  07095
Telephone:  (732) 636-8000
Facsimile:  (732) 726-6686
*kroddy@wilentz.com*

**KALIEL PLLC**
Jeffrey D. Kaliel, Bar Roll No. 518372
Sophia G. Gold, Bar Roll No. 701241
1875 Connecticut Avenue NW, 10th Floor
Washington, DC 20009
(202) 350-4783
*jkaliel@kalielpllc.com*
*sgold@kalielpllc.com*

Attorneys for Plaintiffs and the Putative Class