UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In re:* | Chapter 7 |
| PRIME CAPITAL VENTURES, LLC, | Case No. 23-11302-rel |
| Debtor. | |

## <u>PETITIONING CREDITORS' RESPONSE IN OPPOSITION TO PRIME CAPITAL VENTURES, LLC'S MOTION FOR A BOND</u>

Petitioning creditors Compass-Charlotte 1031, LLC ("Compass"), 526 Murfreesboro, LLC ("526 Murfreesboro") and Newlight Technologies Inc. ("Newlight") (and together with Compass and 526, the "Petitioning Creditors") hereby oppose Prime Capital Ventures, LLC's ("Prime") Motion for a Bond (Doc. 69) (the "Motion"). The Motion should be denied because:

(a) It is now clear that Prime is and was insolvent and its "business" was premised on a Ponzi / fraud scheme run by its principal Kris Roglieri (now a debtor before this Court in his own personal bankruptcy case). The scheme took in over $90 million in "ICA" deposits from victims (like the Petitioning Creditors) and has failed to return those deposits, despite admittedly owing them back. Rather than use the funds as agreed, Roglieri used those ICA deposits to fund a life of luxury and fantastic spending, which included millions for luxury cars, private jet charters and incredibly expensive watches, one of which alone cost more than $2 million dollars. Since the filing, the FBI has executed search warrants at Prime and Roglieri's residence and has seized numerous assets from Roglieri's possession;

(b) Prime and Roglieri lied to this Court about numerous matters directly relevant to the claims, the security and Prime's assets and business. Those misrepresentations included how Prime used the deposits paid by Petitioning Creditors, the amount of assets and money Prime had in its bank accounts, the identity of Prime's accountant, and the number and identity of Prime's employees;

(c) a bond would serve no purpose since given Prime's lack of an actual business, lack of injury, and the fact that Roglieri misappropriated ICA deposits paid by potential borrowers to further his Ponzi scheme. To the extent the filing stopped the payment of ICA Deposits into Roglieri's hands, it did not damage Prime, but actually limited the scope and amount of damage to creditors by causing the Ponzi scheme to implode. Thus, there is no basis for granting any award to Prime under 11 U.S.C. 303(i);

(d) even if the Court were to enter a 303(i) award at some future date (after motion and discovery), no bond is appropriate because Prime and Roglieri are adequately protected by holding over $22 million of Petitioning Creditors' deposits – which they have no right to keep – and against which any 303(i) award could be offset; and

(e) Prime has failed its burden of proof to demonstrate any evidence of bad faith which would justify a bond for alleged damages under 303(i)(2), let alone that a Ponzi scheme like Prime could even have damages.

## FACTS

### 1.  Summary of Prime's Ponzi / fraudulent scheme

The facts of the Ponzi / fraudulent scheme run by Prime and its principal Kris Roglieri are now obvious  and detailed in numerous sworn filings.  Prime's court appointed

Receiver has now admitted that Prime is hopelessly insolvent and Prime's creditors are likely to recover a fraction of the amount owed. Rather than recite those facts, the Petitioning Creditors incorporate by reference the facts contained in the following filings in the related case of *Compass-Charlotte 1031, LLC v. Prime Capital Ventures, LLC*, 1:24-cv-00055 (N.D.N.Y.):

1. Verified Complaint (Dkt. No. 1) (Exhibit 1 (Verified Complaint together with Exhibits 30 and 32)).

2. Receiver's First Status Report (Dkt. No. 37) (Exhibit 2)

3. Receiver's Second Status Report (Dkt. No. 61) (Exhibit 3)

4. Receiver's Amended Second Status Report (Dkt. No. 65) (Exhibit 4)

5. Receiver's Verified Third Party Complaint (Dkt. No. 71) (Exhibit 5)

6. Supplemental Declaration of Paul A. Levine (Dkt No. 90) (Exhibit 6)

7. Declaration of Matthew A. Fistonich (Dkt. No. 106-5) (Exhibit 7)

8. Receiver's Third Status Report (Dkt. No. 107) (Exhibit 8)

9. Permanent Receiver's Declaration in Further Support of His Motion for Injunctive Relief, including Attachment Pursuant to Fed. R. Civ. P. 64 and Expedited Discovery of Third Party Defendants (Dkt. No. 121-1) (Exhibit 9)

10. Receiver's Reply Declaration (Dkt. No. 132-1) (Exhibit 10)

These facts supplement the facts contained in the Petitioning Creditors' Emergency Motion for Appointment of an Interim Trustee filed in this case (and supporting declarations) (Dkt. nos. 4-6), which was the basis for the Court to appoint an interim trustee over Prime.

In sum, initially Roglieri and Prime created fictional large financings allegedly funded by Prime,[1] and then circulated that fiction through Prime's website, PR newswire, an article in DealMaker Magazine (a publication owned by Roglieri), and online videos. Prime promoted these fake financings to create the appearance that Prime could fund large loans through lines of credit, despite completely lacking the funds or ability to actually fund those borrowings. Prime falsely represented it was a "Banker" or a "Boutique Investment Bank", and Prime fraudulently induced numerous unsuspecting victims, including the Petitioning Creditors, to send in millions of dollars in ICA deposits, which were supposed to be held by Prime in ICA Accounts to pay the interest on the funds Prime promised to lend. But, Prime never actually provided funds on those lines of credit to the Petitioning Creditors (and the other victims who put in the $90 million in missing ICA deposits) and, despite numerous promises to Petitioning Creditors that it owed and would return the ICA deposits, failed to do so.

Rather than run a real business, Roglieri and Prime used the ICA deposits to fund Roglieri's sudden life of uber-luxury, which included purchasing multi-million dollar sportscars (some over $3 million), wristwatches (one over $2 million), a $3.75 million mansion in Virginia Beach, and numerous private air charters. Roglieri even used $275,000 of the ICA Deposits to purchase a Ferrari Engine which was made into a table. Exh. 8 at ¶ 22. As detailed in the Receiver's verified third party complaint, Roglieri spent

---

[1] Prime's fake financings included: (1) a "successful $188 million deal with ALUX Properties, LLC" for a hotel in Georgia; (2) apartment complexes in South Korea for $110 million and "just under $300 million"; and (3) "$2.3 billion in funding for the first stage of a massive five-year, five-stage $22 billion project" in Dubai. Dkt. Nos. 4-6 and 4-7.

over $30 million of ICA deposits from third parties on these purchases.  Prime's Receiver

has identified over **$90 million** in ICA deposits that are not located in any Prime account,

and the identified assets are much less than that amount.  District Court Dkt. no. 143 at 2.

(The FBI has seized a number of Roglieri's profligate purchases, as listed in Roglieri's

declaration filed in his personal bankruptcy case.  See Case no. 24-10157, Dkt. nos. 27 and

27-1 (listing 17 luxury vehicles, 9 luxury watches, and other items)).

The requirements in Prime's contracts with its borrower/victims did not deter Prime

and Roglieri's misuse of the ICA funds.  Even when the language of those agreements

required that Prime hold ICA deposits in "a segregated account", a "locked pledged

account", "held as a trust fund" or where Prime pledged that it would "not deliver custody

or possession of any of the Deposit Amount to anyone", Prime and Roglieri nevertheless

spent the deposits on Roglieri's lifestyle (or paying back other ICA deposit creditors), all

within a matter of days from receipt. [2]  This spending and misuse of ICA money is not

ancient history, but took place in September, October and even December 2023, incredibly

after this bankruptcy case was filed.  The simple fact is that Prime stole $90+ million in

---

[2] See Exh. 7 (Fistonich Dec.) (Prime and Roglieri's dissipation of a $2.5 million deposit from SP
Harbor QOZB LP in October 2023 even when the deposit agreement stated that Prime would hold
the funds in a "**segregated account**" and would "**not deliver custody or possession of any of the
Deposit Amount to anyone**"); Exhibit 11 (Affidavit of Ryan Taylor) (Prime and Roglieri's
dissipation of over $14 million ICA deposit in September 2023 despite contract requiring that
funds be held in a "**locked pledged account**"); Exhibit 12 (Declaration of Jeffery Huston)
(Roglieri's dissipation of $5 million ICA deposit in December 2023 through Prime and Prime
Commercial Lending even when deposit agreement required funds to be "**held as a trust fund**").
Thus, Prime's argument about whether the Petitioning Creditors' line of credit agreements had
specific language requiring their deposits be held in a segregated account or not is a red herring.
In any event, there can be no argument that Prime was permitted to use Petitioning Creditor's ICA
deposits without funding their loans.

ICA deposits from its victims, dissipated those funds, and is now hopelessly insolvent and unable to return those deposits.

### 2. Prime and Roglieri Make False Representations to This Court.

After Prime admitted it owed the return of the ICA Deposits and promised to wire them back but then failed, the Petitioning Creditors filed this involuntary bankruptcy on December 19, 2023 to recover the $22 million in deposits owed to them. The Court appointed an interim trustee on December 21, 2023. Prime immediately undertook steps to convince the Court that there was no basis for the bankruptcy filing because Prime had the funds to repay all outstanding ICA deposits, and the only issue was freeing up those funds to so pay the creditors. To escape the bright light of this bankruptcy proceeding which would reveal Prime's fraud, Prime and Roglieri told the Court and Petitioning Creditors numerous falsehoods, including:

#### a. Lie #1 - Prime held the ICA deposits in Prime's accounts

On December 26, 2023, Prime filed a letter with the Court in which it asserted "that all of the ICA deposit funds, which are listed on schedule 1 attached, are being held in Prime Capital's accounts" and that Prime had a total of $61,652,000. Dkt. no. 16 at 2. This was a lie as Prime and Roglieri knew that Roglieri had already spent the ICA deposits on his lifestyle (or used them to pay back other ICA deposit creditors as part of the Ponzi scheme).

#### b. Lie #2 - Prime had $2 million in its accounts at KeyBank

In that same December 26 letter, Prime represented to the Court that Prime had $2,000,000 at KeyBank. In reality, Prime had two accounts at KeyBank, and on December

26, 2023, one account had a balance of $15 and the second had $1,923.66.  Copies of the

KeyBank statements showing this fact are attached (under seal) as Exhibit 13.[3]  A simple

review of the account statements shows the falseness of this representation.

### c.  Lie #3 - Prime had $2 million in its account at CitiBank

In that same December 26 letter (and in further statements discussed *infra*), Prime

asserted that it had $2 million on deposit in an account at CitiBank.  The CitiBank

statements show that between June 1, 2023, and December 26, 2023, Prime actually had

*no* activity in the CitiBank account, and maintained a consistent balance during that entire

period of an amount under $755,000, or less than half of the amount represented to the

Court.  Copies of the CitiBank account statements showing this fact are attached (under

seal) as Exhibit 14.

### d.  Lie #4 - The Petitioning Creditors ICA deposits were held at an RBC

### account.

In connection with the December 21 and 26, 2023 hearings, the Court ordered Prime

to specifically identify in which account Prime held Compass-Charlotte's ICA deposit.  In

response, on December 27, 2023, Prime's counsel sent an email that included a spreadsheet

"detailing information regarding the ICA Accounts . . . including Compass', that provides

the amount of the ICA Account and the account in which such funds are held." (Exhibit

---

[3] The interim trustee reported this fact to the Court at the January 5, 2024 hearing, and both counsel for Prime and the Petitioning Creditors have the KeyBank account statements which confirm these numbers.  *See also* Docket No. 86 (one of the KeyBank statements filed by the U.S. Trustee).

15)[4]  The attached statement repeated the fiction that the amounts were in the accounts at KeyBank and CitiBank, and claimed that each Petitioning Creditor's ICA Deposit was held in an RBC account.  Prime knew this statement was false because it never sent any of the Petitioning Creditor's ICA Deposits to RBC.  Rather those ICA deposits were wired into Prime's CitiBank account and then dissipated by Prime and Roglieri from that same account, without any transfer, ever, to an RBC account.  See Exh. 14 (CitiBank account statements).

### e.  Lie #5 - Prime sent $52 million to Berone which was held at RBC.

Despite Prime's statements, the interim trustee informed the Court that he could not locate the alleged $52 million in ICA deposits or get confirmation that it was at Berone or RBC.  On December 28, 2023, the Court ordered Roglieri to appear and testify about where the missing ICA deposits were.  Roglieri appeared and testified, that the ICA funds were received by Prime, and then deposited into an RBC account in the name of Berone Capital.[5] Roglieri must have known this was untrue because Prime's bank records show that Prime never sent any funds to Berone in calendar year 2023, when Prime received the vast majority of the ICA deposits given to Prime.  Roglieri also claimed that the $50+ million listed on an RBC Berone Account Statement were "Monies that were put into Berone Capital from Prime."  Exhibit 16 (Transcript of 2:00 p.m. hearing on December 28, 2023)

---

[4] Prime's counsel included a header on that email which stated "For Settlement Purposes Only and Inadmissible as Evidence Pursuant to Federal Rule of Evidence 408".  However, that header is meaningless as there was no settlement offer conveyed in the communication and the information provided was in response to this Court's order.
[5] The interim trustee asked Roglieri if "the ICA funds" from borrowers were deposited with Berone and Roglieri said, "That is correct."  Exh. 16 at 11:2-17.

at 12:9-10.  Again, Roglieri must have known this was untrue because the <u>only</u> money that Prime ever sent to Berone was $20 million in the fall of 2022.  That 2022 transfer was then paid to "Reign Capital" and Prime actually brought a lawsuit in February 2023 to force the return of that amount.  Dkt. 4-4 at ¶¶ 11, 40, 59.  Thus, Prime and Roglieri must have known that Berone did not hold anywhere near $50 million on Prime's behalf in any account, anywhere or at any time.[6]

> *f.  Lie #6 - Berone provided Prime with a credit line which Prime used to fund its loan obligations to third parties*.  Roglieri told the Court that Prime's business was based on giving Berone the ICA deposits, which Berone then used to borrow a multiple of that amount and then made those borrowings available for Prime to fund its obligations to borrowers.[7]  The Receiver has investigated that claim and it is a fiction.  Putting aside that there is no evidence that Prime ever gave the ICA deposits to Berone, there is no evidence that Berone ever agreed to provide Prime with a "line of credit" at any time.  Berone itself

---

[6] Prime and Berone both now admit that the alleged $52 million account statement from RBC was a fabrication, and point fingers at each other as to who actually fabricated it.  <u>See</u> District Court dkt. 70-1 at 15 (Prime admitting that the $52 million RBC statement was a fabrication).  Notably, however, Berone's principals have stated under oath that "Prime never wired $50 million to Berone" and "there is no (and never has been any) account at RBC associated with Berone Capital with $50 million in it for the benefit of Prime".  District Court Dkt. 128 at ¶ 17 (<u>Exhibit 17</u>).  Neither Roglieri nor Prime have presented any sworn evidence that they received the fabricated RBC statement *from Berone*, or any sworn statement that they did not fabricate that statement.  They have also not provided any explanation why they would believe any such statement since Prime never sent anywhere near $50 million to Berone, and the money that was sent in 2022 was misappropriated and the subject of a pending federal court lawsuit.  Despite numerous requests, Prime has never provided **any** evidence that it actually sent funds to Berone, other than the $20 million which is the subject of the Reign lawsuit.

[7] Roglieri testified that "So those [ICA] funds are over [at Berone] and, on a -- in a simple term, right, Prime's account is under Berone.  And those funds are levered, right, in order to essentially award Prime a credit line to fund transactions."  Exh. 16 at 11:13-17.

has now disputed this incredible tale, and Roglieri's testimony about Prime's entire business model is an imaginary tale of fiction.[8]

   g.  *Lie #7 – The identify of Prime's accountant and custodian of Prime's financial records*.  Roglieri told the Court that the Sardone accounting firm had access to the books and records of Prime and "completely handle our accounting, one hundred percent."  Exh. 16 at 32:9-33:6.  Yet when the interim trustee (and then subsequently the receiver) contacted Sardone, the accountant informed them that he had no records for Prime and did no work for it.  Indeed, on February 14, 2024, the receiver spoke with Mr. Sardone who said "he had not been asked to . . . and has not done work for Prime Capital Ventures LLC.  He also stated that [Roglieri] is always 'years' behind in tax filings."  Exh. 10 at ¶ 4.[9]

   h.  *Lie #8 - Prime had 26 employees*.  Roglieri also told the Court that Prime had an average of "around twenty" employees, with some on payroll and "some act as more like an independent contractor."  Exh. 16 at 25:23-26:10.  Then in his January 7, 2024 declaration filed in support of this bond motion, Roglieri stated under penalty of perjury that "Prime Capital employs a staff of 26 employees."  Dkt. no. 71 at ¶ 4.  However, on January 16, 2024, Roglieri told the Receiver that "Prime has no employees and its business

---

[8] Prime also asserted that it was party to a joint venture agreement with Berone. The principals of Berone have provided a sworn declaration that the joint venture agreement is a fake and Berone has never been party to such an agreement with Prime. Exh. 17 at ¶ 6.  Prime and Roglieri have provided no sworn statements to the contrary.

[9] Mr. Sardone's statement is directly confirmed by Kris Roglieri whose **2021** tax return was just prepared a few days ago, on February 19, **2024**.  *See* Roglieri Bankruptcy case 24-10157, Dkt. no. 26-1.

associates are all independent contractors." Exh. 2 at ¶ 19. Prime's counsel has subsequently confirmed to the District Court that Prime has no employees, contrary to Mr. Roglieri's testimony and sworn declaration.

## **ARGUMENT**

## **1.  The Court should exercise its discretion and peremptorily decide that no 303(i) award will be given to a Ponzi scheme debtor like Prime.**

The purpose of a bond under either 11 U.S.C. 303(e) or Bankruptcy Rule 2001(b) is to "indemnify the debtor" if the Court ultimately exercises its discretion to allow an award of attorneys' fees, costs or damages under 303(i).  Any such award is within the discretion of the Court.  See 11 U.S.C. § 303(i) ("the court **may** grant judgment").  As Prime notes in its brief, courts employ a "totality of the circumstances" to determine whether any award of attorneys' fees should be given, including "the role of any improper conduct on the part of the alleged debtor."  Dkt. no. 69 at 15.

In this case, the improper conduct by Prime is so overwhelming that the Court should immediately exercise its discretion to determine that no 303(i) award will be granted in any event and thus no bond is appropriate or required.  The facts, as demonstrated by numerous sworn statements, are that:

(a) Prime fabricated numerous multi-million dollar deals (like the fake $188 million funding of ALUX Properties in Georgia) to fraudulently convince third party borrowers to give it money;

(b) Prime represented in the transaction documents that it had the "financial ability" to fund the lines of credit in full;

(c) Prime was paid $22 million in ICA deposits from the Petitioning Creditors and Prime promised to fund multi-million dollar lines of credit that totaled almost $110 million to the Petitioning Creditors;

(d) Prime did not provide the lines of credit or any borrowings to any Petitioning Creditor;

(d) Prime did not use the ICA deposits as agreed but immediately spent the funds on, among other things, luxury purchases for Prime's principal, including multi-million dollar wristwatches and luxury cars;

(e) After termination of the credit agreements, Prime promised to return the ICA deposits to the Petitioning Creditors, and even told them the wires were imminent, but never returned them;

(f) Prime lied repeatedly to this Court regarding what happened with the ICA deposits and regarding Prime's entire business model (as set out in detail above);

(g) the FBI has executed search warrants and seized assets in Kris Roglieri's possession that were purchased with creditor's ICA deposits (and Roglieri and Kimmy Humphrey a/k/a Kimberly Owen have been charged with felony gun and drug charges arising from items discovered during those searches);[10]

(h) Prime has not contested its fraud and bad actions in numerous legal actions and has had judgments entered against it and Roglieri for failure to return ICA deposits. Those

---

[10] Roglieri has been charged with the felony charges for possession of an assault weapon and a large capacity ammunition feeding device in Queensbury Town Court (Incident #2024-02032) (Exhibit 18).  Kimberly Humphrey a/k/a Kimberly Owen was charged with felony drug possession in Virginia Beach General District Court (Case #GC24001209-00) (Exhibit 19).

proceedings include Prime's default on a $12.4 million dollar lawsuit by Camshaft in Miami (Verified Complaint Exh. 1 at Exh. 32);[11] arbitration award and judgment for B&R Acquisition Partners for $4.3 million (Exhibit 20); and default of Prime and judgment against Roglieri for $3 million for fraud for Onward Holdings (Exhibit 21); and

(i) Prime (and the Receiver) cannot account for over **$90 million** in ICA deposits that remain missing, and Prime has no financial statements, never filed a tax return and has never registered to do business in New York.

If there is ever an insolvent bankrupt entity, it is Prime.[12]  Accordingly, given the admitted facts, any debate about whether Petitioning Creditors should post a bond or be required to pay 303(i) damages is both misplaced and an obvious ploy to divert attention from Prime's fraud and misrepresentations to this Court.  Thus, the Court should exercise

---

[11] Compass-Charlotte has moved to disqualify Hogan Lovells in the District Court action, and likewise informed this Court that Hogan Lovells should be disqualified from representing Prime. At the same time that Hogan is before this Court arguing that Prime is "a successful business" (Dkt. No. 69 at 3), it simultaneously is counsel of record for Camshaft suing Prime for return of a $12.4 million ICA deposit and asserting "significant concerns about Prime, including . . . (iii) misrepresentation of its capability to successfully close transactions, (iv) misrepresentations of its ability to fulfill its contractual duties, including certain breaches of its fiduciary duties, and (v) its fundamental operational, financial, and legal soundness".  Dkt. 4-17 at ¶ 14.  Hogan Lovells is simultaneously speaking out of both sides of its mouth on the exact same factual question.  Hogan's allegations in the Camshaft lawsuit have been admitted by Prime by default, and are clearly the true ones.

[12] The other factors in the "totality of the circumstances" test (merits of the involuntary petition, reasonableness of the actions taken by the petitioning creditors, and motivation and objectives behind the filing of the petition) are all equally in support of no award under 303(i).  On the merits of the petition, Prime is indisputably insolvent and has been running a Ponzi / fraud scheme.  Filing an involuntary bankruptcy petition was reasonable as Prime was not returning $22 million in deposits all while Kris Roglieri was bragging about his luxury living on social media.  And the motivation and objectives behind the filing of the petition was for the Petitioning Creditors to get their ICA deposits returned, while avoiding preferential and fraudulent transfers of Prime assets to Roglieri and others.

its discretion to deny the bond motion out of hand on the ground that the Court will not grant any 303(i) award in light of Prime's overwhelming fraudulent conduct, including numerous direct lies to the Court.[13]

**2.  Prime is not entitled to any bond since it is already holding $22 million in Petitioning Creditors' cash to indemnify itself against any future 303(i) award**.

If the Court does not conclude that no 303(i) damages will ever be awarded, then it must determine whether, in its discretion, there is any reason to require the Petitioning Creditors to post a bond.  A bond is designed to serve two purposes: (a) to discourage frivolous petitions; and (b) to "indemnify the debtor" for any 303(i) award.  See In re Secured Equipment Trust of Eastern Airlines, Inc., 1992 WL 295943 at *6 (S.D.N.Y. Oct. 8, 1992) (quoting H.R. Rep. No. 95-595, 9th Congr., 1st Sess. 323 (1977).  A bond in this case would serve neither purpose.

---

[13] Petitioning Creditors also note that a 303(i) award is only available when a case is dismissed "other than on consent of all petitioners and the debtor".  In this case, the dismissal was done on consent of all petitioners and the debtor, albeit, as the dismissal order states, Prime specifically reserved its "right to seek a judgment against the Petitioning Creditors pursuant to 11 U.S.C. § 303(i))".  Dkt. no. 87.  Several courts have held that a reservation of 303(i) rights (even in a court order) is not sufficient to overcome the clear statutory language of 303(i) and a party "has no authority to provide for itself a statutory remedy where the prerequisites for eligibility for that remedy have not been met".  *In re International Mobile Advertising Corp.*, 1991 WL 156588 (E.D. Pa. 1991) (finding no statutory basis for 303(i) award following consensual dismissal).  *See also In re Analytica Wire, Inc.*, 392 B.R. 618, 622 (Bankr. D. Del. 2008) (same).  *But see in re CNG Foods LLC*, 2020 WL 4219679 (Bankr. E.D.N.Y. 2020) (holding that reservation of 303(i) rights was preserved despite consent dismissal).  This is an additional basis for denial of any 303(i) award to Prime.  However, Petitioning Creditors recognize that the caselaw is divided on this point and parties routinely rely upon reservation of rights language in court orders.  Accordingly, Petitioning Creditors raise this argument solely in the alternative and request that the Court rule first based upon the grounds identified in their other arguments, particularly the fact that there should be no award in light of Prime's egregious conduct.

At this stage of the proceedings, a bond serves no deterrent effect. The petition was already filed and has now been dismissed by consent. Thus, there is no conduct to deter.[14] As to the indemnification role of a bond, it is plainly clear that Prime needs no indemnification from any 303(i) award. After all, Prime owes **$22 million to Petitioning Creditors, and has received that cash and provided nothing of value in exchange.** That claim serves the functional equivalent of a bond (*i.e.* if Prime is granted a 303(i) award, Prime can easily set off such award against the Petitioning Creditors' cash that it received and must return).[15] That fact alone makes this case completely unique from any other reported involuntary bankruptcy petition in which a Court was asked to consider whether a bond was needed to "indemnify the debtor" from the collection risk of a future 303(i) award.

### 3. Prime has not met its burden of proving bad faith damages.

Prime may respond that it has asked for a bond for $37 million to indemnify it for bad faith damages under 303(i)(2), because it was precluded from receiving millions in further ICA funds. This argument is meritless.

If a court decides to require a bond to "indemnify the debtor" under either 303(e) or Bankruptcy Rule 2001, that bond is ordinarily limited to an amount to cover any future award of attorneys fees and costs under 303(i)(1). In this case, Prime's attorneys' fees and

---

[14] Not only is there nothing to deter but the issue of a bond under Bankruptcy Rule 2001(b) is also moot since the Court has already terminated the interim trustee in this case at Petitioning Creditors' request.

[15] There is no set of circumstances in which Prime just gets to keep $22 million from Petitioning Creditors for free while having provided nothing in return. Such a position has no basis in either law or equity.

Case 23-11302-1-rel    Doc 140    Filed 02/28/24    Entered 02/28/24 14:30:51    Desc
Main Document    Page 16 of 21

costs are known through Prime's Rule 2016 reports filed after the dismissal order was entered. Prime's attorneys' fees are around **<u>$450,000</u>**, which includes (a) $76,810.50 from Cullen and Dykman LLP (Dkt. no. 101) and $382,703.00 from Hogan Lovell (Dkt. no. 112).[16]

Prime argues that it needs a $37 million bond in place because of the alleged "bad faith" of Petitioning Creditors in filing the involuntary bankruptcy petition. This argument fails because (a) Prime has not shown any evidence of bad faith; (b) as a matter of law, Prime could not have any damages since it was a Ponzi fraud scheme and not a legitimate business; and (c) even if it could have damages, Prime has not met its burden of proving such damages.

A bond **<u>cannot</u>** include an amount to cover alleged 303(i)(2) damages unless the debtor first presents evidence sufficient to establish a case of bad faith. <u>See Eastern Airlines, Inc.</u>, 1992 WL 295943 at *6 ("the putative debtor must establish a prima facie case of bad faith before petitioning creditors may be required to post a bond under § 303(i)(2)."); <u>see also</u> <u>In re Ransome Group Investors I, LP</u>, 423 B.R. 556, 558 (Bankr. M.D. Fla. 2009) (same). "There is a presumption of good faith in favor of the petitioning creditor, and thus the alleged debtor has the burden of proving bad faith." <u>In re Bayshore Wire Products Corp.</u>, 209 F.3d 100, 106 (2d Cir. 2000) (citing to <u>Eastern Airlines</u> and finding that presumption of good faith was not rebutted when evidence existed that debtor

---

[16] Prime's attorneys have not provided fee statements showing what these fees were incurred for. Petitioning Creditors reserve all rights in this regard, including the argument that the majority of these fees were incurred as a result of Prime and Roglieri lying to the Court and refusing to comply with the Court's orders.

was not paying its debts in normal course on petition date).  The alleged debtor's burden is a "heavy one".  In re Reveley, 148 B.R. 398, 406 (Bankr. S.D.N.Y. 1992).

First, and most importantly, Prime was not damaged by the involuntary bankruptcy filing.  Prime's only evidence is the filed Roglieri declaration which misrepresented that Prime had 26 employees.  In that declaration, Roglieri states: "I estimate that, as a result of the Petition, Prime Capital has lost approximately $35 million in LOC fees."  Dkt. no. 71 at ¶ 13.  There is no evidence to support this estimate and no evidence of causation.  While Prime argued that it needed to be able to close loans, this Court and the Interim Trustee made it clear repeatedly throughout the bankruptcy that Prime would be allowed to close loans with third parties if Prime would simply show the trustee how those loans would be funded.  Not surprisingly, Prime never presented any evidence of ability to fund any loan to anyone except through perpetuation of the Ponzi scheme.  Prime is and was indisputably insolvent, with no ability or source to fund any loans, and could not return the $90 million in ICA deposits it already owed to borrowers, much less fund any new borrowings.

Roglieri's "$35 million" flight of fancy appears to just be an estimate of additional ICA deposits he could have scammed from unsuspecting victims if the involuntary bankruptcy had not made his Ponzi scheme public.  See December 22, 2023 email from Prime's lawyers (Sheppard Mullin) to the interim trustee (listing loans allegedly scheduled to close with ICA deposits totaling over $35 million and indicating that Sheppard Mullin had no information regarding Prime's "funding sources") (Exhibit 22).

Moreover, proof of bad faith is distinct as to each petitioning creditor.  See Reveley, 148 B.R. at 406 ("An alleged debtor must prove separately bad faith by each petitioning

creditor against whom it seeks an award of damages under § 303(i)(2)."); *compare* 11 U.S.C. § 303(i)(1) (attorneys fee award can be made "against the *petitioners*") *with* 303(i)(2) (bad faith award can only be made "against any *petitioner* that filed the petition in bad faith"). Thus, Prime must provide distinct evidence of bad faith as to *each* Petitioning Creditor from whom it seeks a bond in excess of the amount of attorneys' fees. Prime has not met that burden.

   1. <u>Compass-Charlotte</u>. Prime claims that there was "bad faith" by Compass because of portions of two texts sent to Kimberly Humphrey the week before the bankruptcy was filed. The first text was responding to a December 13, 2023 text from Kimmy saying that Kris Roglieri had contacted Thomas F. Taft, Jr. at Compass about returning Compass' ICA deposit. Thomas responded:

> Thanks for the text.
>
> Yes he did reach out with more BS . . . saying wire was pending I guess into Prime but then went silent. I asked for a screenshot or some other confirmation but got nothing. It tracks with what we're seeing and hearing from conversations with others suing for their money back. Things are going to get really bad as we're all working together. Potential for forced bankruptcy, criminal charges and media coverage.

Doc. 70-16. The second is a snippet of a text from December 14, 2023 in which Thomas said "We're 24 hrs until thermonuclear war begins." Doc. 70-17. These two snippets of texts are taken out of context and do not demonstrate any bad faith but rather an attempt to avoid litigation and provide Prime with a chance to honor its repeated promises.

   The full series of texts are filed as Exhibit 30 to Compass' verified complaint against Prime in the district court (refiled as Exhibit 1 hereto). To the extent a demand for the

return of promised funds to avoid legal action is relevant, the complete text strings between Thomas Taft, Kris Roglieri and Kimmy Humphrey refute any such inference.   Prime conveniently omits December 15 texts from Thomas Taft to Roglieri and Humphrey in which he made it clear that Compass only wanted to get its deposit back and fulfillment of that promise would fully resolve the matter.  Id. at 42 ("Just remember we're not looking for anything more than what you're holding of ours."); Id. at 32 ("All I can say is that we made every attempt to make claim as narrow as possible at your guidance to avoid any doubt about us trying to get more than what is owed to us for ICA funds.")  Telling an opponent that it can avoid "potential for forced bankruptcy, criminal charges and media coverage" if it simply gives you back your deposit funds (and not a dollar more) is the opposite of bad faith and shows a creditor who just wanted its money back and to avoid any disputes or escalation.

2.  Newlight Technologies.  Prime presents no evidence of Newlight's bad faith and simply states that Newlight should have done more due diligence on 526 Murfreesboro and Compass before joining the involuntary bankruptcy petition (Dkt. no. 69 at 23).   Prime offers no legal support for this argument.   Both Compass and 526 Murfreesboro provided sworn declarations regarding the facts of their paid ICA deposits, Prime's failure to fund, the termination of the LOC and the entitlement to return, as well as Prime's promises to return the ICA Deposits. It is hardly "bad faith" to rely on those sworn facts.

3.  526 Murfreesboro.  Prime alleges that 526 Murfreesboro acted in bad faith by threatening to publicly disseminate information about Prime's fraudulent lending scam

if Prime did not compensate 526 Murfreesboro for its damages, and then disseminating that information when Prime failed to do so. Prime claims its business was damaged by that information. But that makes no sense. 526 Murfreesboro provided truthful information to other parties – that Prime was a fraudulent scheme which failed to fund loans. Plus, as demonstrated in detail above and in the bankruptcy and receivership proceedings, Prime's business was defrauding victims – it can have no claim against 526 Murfreesboro for exposing this scheme and stopping even further fraud.

## CONCLUSION

As the independent third-party receiver appointed by the District Court over Prime succinctly stated in his sworn February 12, 2024 declaration:

> [T]he evidence has convincingly demonstrated; that Prime was operated as a Ponzi scheme and that Kris Roglieri used the company and the tens of millions of dollars funded into it by borrowers for deposits as his own personal piggy bank to enjoy a life of gross consumption of luxury items and travel, to fund his other businesses and to otherwise benefit himself and his estranged wife and Kimberly Humphrey far, far, beyond any reasonable basis.

Exh. 9 at ¶ 3. Given these incontrovertible facts, no 303(i) award is proper and no bond is needed.

**WHEREFORE**, for the reasons stated herein and to be more fully discussed at the hearing on this motion, the Petitioning Creditors respectfully request that the Court deny Prime's motion for a bond and grant such further relief as is just and proper.

**Dated:** Albany, New York
February 28, 2024

                                       **NOLAN HELLER KAUFFMAN LLP**

By: /s/ Justin A. Heller
       Justin A. Heller, Esq.
       Matthew M. Zapala, Esq.
       *Attorneys for Petitioning Creditors*
       80 State Street, 11th Floor
       Albany, New York 12207
       (518) 449-3300

       *Attorneys for Petitioning Creditors*

       **PARKER, POE, ADAMS & BERNSTEIN LLP**

       William L. Esser, IV (*pro hac vice*)
       620 South Tyron St., Suite 800
       Charlotte, NC 28202
       T: 704-335-9507
       F: 704-334-4706
       E: willesser@parkerpoe.com

       *Attorneys for Compass-Charlotte 1031, LLC*